# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Ameer A. Hashw, on behalf of himself and
others similarly situated,

                        Plaintiff,          Civ. No. 13-727 (RHK/BRT)

**MEMORANDUM OPINION
AND ORDER**

v.

Department Stores National Bank and
FDS Bank,

                        Defendants.

---

Mark L. Heaney, Heaney Law Firm, LLC, Minnetonka, Minnesota, Alexander H. Burke, Burke Law Offices, LLC, Chicago, Illinois, for Plaintiff.

Amy L. Schwartz, Lapp, Libra, Thomson, Stoebner & Pusch, Minneapolis, Minnesota, Julia B. Strickland, Marcos D. Sasso, Shannon E. Dudic, Stroock & Stroock & Lavan LLP, Los Angeles, California, Martin C. Bryce, Jr., Mark J. Furletti, Ballard Spahr LLP, Philadelphia, Pennsylvania, for Defendants.

---

# INTRODUCTION

This action arises out of automated debt-collection telephone calls made by

Defendants Department Stores National Bank ("DSNB") and FDS Bank ("FDS") in

connection with Macy's and Bloomingdale's credit-card accounts.  Plaintiff Ameer

Hashw, acting on behalf of himself and a nationwide class of persons who received such

calls, commenced this action in 2013, alleging the calls violated the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227(b).  Following discovery and after two days of

private mediation, the parties reached a settlement in mid-2015; the Court preliminarily

approved that settlement, certified a settlement class, and directed notice be provided to class members.  With notice now having been provided, Hashw moves for final approval of the settlement, as well as attorneys' fees and an "incentive award" for litigating this case on behalf of the class.  For the reasons that follow, the Motion for settlement approval will be granted, and the Motion for fees and an incentive award will be granted in part and denied in part.

## BACKGROUND

In 2006, Hashw opened a Macy's branded credit card, which was issued by DSNB.  He fell behind on his payments and, between December 2010 and February 2011, DSNB called his cellular phone 112 times using an automated telephone dialing system ("ATDS").  He did not consent to DSNB contacting his cellular phone; in fact, he claimed he had never provided his number to DSNB and that it had obtained the number through a credit bureau or "skip trace" service.  Because the TCPA prohibits calls to a person's cellular phone using an ATDS without prior consent, see 47 U.S.C. § 227(b), Hashw commenced this action, individually, seeking compensatory damages and an injunction prohibiting DSNB from using automated dialers to call cellular phones.

Shortly after bringing the action, Hashw amended his Complaint to add FDS as a Defendant[1] and to allege class claims, asserting that numerous others had been subjected to the same illegal automated calls on their cell phones.  Defendants responded by

---

[1] In its Answer, DSNB asserted, without explanation, that FDS was a proper Defendant.  As a result, Hashw joined FDS in his Amended Complaint, although he alleged he did not know its connection to this case.  (Am. Compl. ¶ 9.)  As the Court now understands it, Macy's branded credit cards were issued by both DSNB and FDS during the period in question, and hence both allegedly placed the challenged calls.

moving to dismiss, which Motion was fully briefed and denied by the Court in November 2013.  The parties then undertook discovery, including the production of documents from Defendants and third parties via subpoena, and engaged in motion practice before the Magistrate Judge.

In May 2014, the parties agreed to mediation before retired United States Magistrate Judge Morton Denlow in Chicago; this action was stayed in the interim, although the parties continued to exchange information, in particular regarding the size and scope of the putative class, in order to facilitate settlement discussions.  The parties mediated for two days and eventually reached an agreement in principle to settle this case on a class-wide basis.  It then took several months to finalize the settlement documents, with the parties participating in telephone conferences with the Magistrate Judge on no fewer than eight occasions before finally seeking preliminary settlement approval in July 2015.  The settlement's material terms were:

1.      A "settlement class" would be certified, consisting of all persons nationwide whose cell phones were called, without consent, by Defendants or their agents using an ATDS between September 3, 2009, and July 22, 2015,[2] in connection with collecting on Macy's or Bloomingdale's[3] credit-card accounts.  The parties estimated the

---

[2] September 3, 2009, was four years prior to the date of the Amended Complaint – the TCPA has a four-year statute of limitations – and July 22, 2015, was the day prior to filing the Motion for Preliminary Settlement Approval.

[3] The Court is informed that DSNB (a subsidiary of Citibank) and FDS also issued or serviced Bloomingdale's branded credit cards and, hence, ATDS calls also may have been made to collect on Bloomingdale's accounts during the class period.

class comprised approximately 1.1 million individuals (a number they later revised to 1.2 million after conducting "confirmatory" discovery);[4]

2.　　Each class member would release DSNB, FDS, Macy's, Bloomingdale's, and Citibank from all claims "aris[ing] out of or . . . related in any way to the actual or alleged use [by the released entities] of an artificial or prerecorded voice and/or of any automatic telephone dialing system . . . to make . . . calls to collect on Macy's and/or Bloomingdale's credit card accounts" during the class period;

3.　　Defendants would pay $12.5 million into a fund from which each class member timely submitting a claim would receive a check representing his or her *pro rata* share of the fund (minus attorneys' fees and administrative costs);

4.　　A claims administrator (Heffler Claims Group) would be appointed to provide notice to class members by e-mail and regular mail, by advertising in nationwide publications, and by a settlement website regarding (a) the proposed settlement, (b) the manner in which to submit a claim form, and (c) the means to opt out of the settlement. All settlement administration expenses would be paid from the settlement fund;

5.　　Class counsels' fees and costs would be paid from the settlement fund, and Defendants would not oppose such fees and costs as long as they did not exceed 1/3 of the fund;

---

[4] Defendants apparently did not maintain records indicating which credit-card holders were contacted on their cell phones between October 2011 and February 2013, and hence the exact size of the settlement class could not be determined.

6.     Hashw would be paid a $27,500 "incentive award" from the settlement fund, to which Defendants would not object;[5]

7.     After the initial distribution to the class and the payment of administrative costs, attorneys' fees, and the incentive award, any money remaining in the fund – for example, from uncashed checks sent to class members – would be redistributed to all class members having cashed their settlement checks, unless the amount of each redistribution was so small as to be economically impractical ($3 or less); and

8.     Any funds remaining after the second distribution to class members would be allocated to *cy pres* recipients, so that no portion of the fund would revert to Defendants.

The Court reviewed the proposed settlement and held a hearing on August 28, 2015. A short time later, it granted preliminary approval, conditionally certified the settlement class contemplated by the parties' agreement, and directed that notice be provided to the class in accordance with the settlement. Heffler then undertook a broad notice campaign, including (i) creating a settlement website, (ii) directly contacting all potential class members for whom it had either an email or mailing address, informing them of the settlement and directing them to the settlement website for more information, (iii) establishing a toll-free number class members could call with questions about the settlement, and (iv) running nationwide ads regarding the settlement in *People* magazine and *USA Today*. According to Heffler, more than 4.5 million potential class members

---

[5] Notably, the settlement was not conditioned on Court approval of the requested attorneys' fees or the incentive award.

were reached through email and mail alone.[6]  As of February 26, 2016, Heffler had

received claim forms from 252,078 individuals.  An additional 30 persons opted out of

the settlement, and 5 others submitted written objections, which are discussed in more

detail below.

Hashw now seeks final approval of the settlement, and Defendants join that

Motion.  Hashw also moves for an incentive award of $27,500 for litigating this case on

behalf of the class, and his counsel seek a fee award of 1/3 of the settlement fund,

approximately $4.166 million; Defendants have not objected to these requests.  The Court

held a hearing on February 26, 2016, at which all parties (and no objectors) appeared, and

then requested additional briefing on the fee issue.  Additional briefing having now been

submitted, both Motions are ripe for disposition.

## I.      Settlement approval

### A.      General principles

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action

requires court approval where, as here, it binds class members.  Such approval may issue

"only after a hearing and on finding that [the settlement] is fair, reasonable, and

adequate."  Fed. R. Civ. P. 23(e)(2).  Review of a proposed class-action settlement,

therefore, proceeds in two stages.  At the first stage, the parties submit the proposed

settlement to the Court, which must then make "a preliminary fairness evaluation."

---

[6] More people were notified of the settlement (4.5 million) than the parties estimated to comprise
the settlement class (1.2 million) because notice was provided to *everyone* for whom Defendants
maintained cell phone data during the class period; however, only individuals who were
contacted *without consent* are class members.

Manual for Complex Litigation (Fourth) (hereafter, "Manual") § 21.632 (2004); accord, e.g., Valencia v. Greater Omaha Packing, Nos. 8:08CV88, 8:08CV161, 2013 WL 5347442, at *1 (D. Neb. Sept. 23, 2013). If the proposed settlement is preliminarily acceptable, the Court directs that notice be provided to absent class members, in order to afford them an opportunity to be heard on, object to, and opt out of the settlement. Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5); see also Grunin v. Int'l House of Pancakes, 513 F.2d 114, 120 (8th Cir. 1975) ("[D]ue process requires that notice of a proposed settlement be given to the class.").

Rule 23(e) "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995). Hence, the Court must "act[] as a fiduciary, serving as a guardian of the rights of class members." In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 932 (8th Cir. 2005). Only careful review of a settlement can discharge this obligation. Manual § 21.61 ("Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle.").

### B.     The settlement merits approval

Having carefully reviewed (and already preliminarily approved) the parties' settlement, the Court concludes that it is fair, reasonable, and adequate. It reaches this conclusion for several reasons.

*First*, the settlement enjoys a presumption of fairness.  See, e.g., In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1063 (8th Cir. 2013) (citing Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1, 921 F.2d 1371, 1391 (8th Cir. 1990)) (settlement agreements are "presumptively valid").  This is especially true because the settlement was reached through mediation with a third-party neutral, and only after substantial discovery had taken place.  See, e.g., In re Zurn Pex Plumbing Prods. Liab. Litig., MDL No. 1958, 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013) (Montgomery, J.).

*Second*, the Court has weighed the strength of the class's case against the recovery being offered.  See In re Wireless Tel., 396 F.3d at 933 ("The most important consideration . . . is the 'strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'") (quoting Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1150 (8th Cir. 1999)).  This is not a simple mathematical exercise with definite outcomes; a "high degree of precision cannot be expected in valuing a litigation."  Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks and citations omitted).

Several obstacles faced the class in this case.  While a TCPA plaintiff may recover his actual damages, proving such damages would be a difficult exercise:  what "injury" (if any) flows from an unauthorized robocall to one's cellular phone, and what is such an "injury" worth?  See In re Capital One Tel. Consumer Prot. Act Litig., 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (noting that class members in similar TCPA action "did not suffer any actual damages beyond a few unpleasant phone calls").  True, the TCPA also

provides for *statutory* damages of $500 per violation, in the alternative to actual damages, but one could hardly expect a jury to award $500 *per call* to 1.2 million class members – a verdict likely exceeding several billion dollars.  See id. (noting that a "complete victory" was unlikely in a TCPA case alleging billions of unlawful cell phone calls, as it would "most surely bankrupt the prospective judgment debtor").

Furthermore, Defendants have not maintained complete records regarding which persons were contacted, making proof issues tricky at best.  Indeed, Defendants have denied using an ATDS *at all* to collect on Macy's and Bloomingdale's accounts and have asserted that at least some individuals they contacted consented to cell phone calls, further complicating the ability to recover.[7]  By the same token, such consent issues might have rendered this case inappropriate for class certification had litigation proceeded, as the individualized issue of consent may well have predominated over common questions of law and fact.  See Marshall v. Nat'l Football League, 787 F.3d 502, 514 (8th Cir. 2015) (difficulty in obtaining class certification is a valid consideration when evaluating strength of plaintiffs' case).  This is no illusory concern in the Eighth Circuit.  See, e.g., Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 374-76 (8th Cir. 2013) (reversing class-certification order due to individualized issues of proof); In re St. Jude

---

[7] There is no supporting detail in the record regarding consent, "but the [C]ourt suspects that many class members may have consented pursuant to a condition contained in their cardholder agreements . . . or by providing their cell phone numbers to [Defendants] at some point after opening their credit cards.  'Prior express consent' under the TCPA is a term of art, the unsettled meaning of which has led to significant . . . litigation.  According to a 2008 FCC order, autodialed collection calls to 'wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent" of the called party,' and are therefore permissible."  Wilkins v. HSBC Bank Nev., N.A., No. 14 C 190, 2015 WL 890566, at *6 (N.D. Ill. Feb. 27, 2015) (citations omitted).

Med., Inc., 522 F.3d 836, 840-41 (8th Cir. 2008) (rejecting, for the second time, district court's certification of class where individualized issues predominated over common ones). And without the ability to proceed as a class, it is unlikely most class members would have had any effective means of obtaining relief. See, e.g., Murray v. GMAC Mortg. Corp., 434 F.3d 948, 953 (7th Cir. 2006) (noting that class actions were designed for cases "in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate"). Simply put, there were real questions whether this case would have been able to proceed as a class action, and even assuming class-action treatment were appropriate, recovery by the class was by no means certain.

On the flip side, the recovery provided to class members by the settlement is not insubstantial. Approximately 250,000 valid claim forms have been submitted, to be divided *pro rata* from a fund that will contain nearly $8.3 million dollars.[8] In other words, each claimant will receive approximately $33.20 ($8.3 million divided by 250,000 claimants). This figure compares favorably with settlements in other TCPA class actions. See Couser v. Comenity Bank, 125 F. Supp. 3d 1034, 1044-45 (S.D. Cal. 2015) (approving TCPA settlement in which class members received $13.75 each); In re Capital One, 80 F. Supp. 3d at 794 (approving TCPA settlement in which class members received $34.60 each); Rose v. Bank of Am. Corp., No. 5:11-CV-2390, 2014 WL 4273358, at *5 (N.D. Cal. Aug. 29, 2014) (approving $32 million TCPA settlement

---

[8] Heffler has estimated that administrative costs will total approximately $1.7 million, which will be deducted from the $12.5 million settlement fund. From the remaining $10.8 million, class counsel will be awarded $2.5 million in fees, as discussed below, and hence approximately $8.3 million will be split by the class.

where class members received on average between $20 and $40).  Given that victory was

by no means certain and even if achieved, victory likely would have been a lengthy and

costly affair for class members (as the TCPA includes no fee-shifting provision), in the

Court's view an immediate, definite payment of $33.20 is both reasonable and fair.

*Third*, the Court has considered "the complexity and expense of further litigation."

In re Wireless Tel, 396 F.3d at 932.  This factor, too, supports approval of the settlement.

Administering a case with more than a million potential plaintiffs would have been

inherently complex and time-consuming.  Moreover, as noted above, class certification

would have proved a significant obstacle for Hashw to surmount given the issue of

consent.  Had the Court certified a class, it has little doubt Defendants would have

attempted to appeal that certification to the Eighth Circuit, contributing further to the time

and expense necessary to litigate.  See Fed. R. Civ. P. 23(f) (party may seek interlocutory

appeal of class-certification orders).  And assuming that such a certification order

withstood scrutiny, proving liability and damages at trial would have been both costly

and tedious.

*Fourth*, and finally, the Court has considered the amount of opposition to the

settlement – or, more accurately here, the lack thereof.  In re Wireless Tel., 396 F.3d at

392.  Indeed, the settlement agreement has been quite well received by the class.  Not

only is the "take rate" – the number of submitted claims compared to the size of the class

– relatively high at more than 20% (250,000 claimants out of 1.2 million class members),

see, e.g., Small v. Target Corp., 53 F. Supp. 3d 1141, 1142 n.1 (D. Minn. 2014) (Kyle, J.)

(noting that claims-made settlements "regularly yield response rates of 10 percent or

less") (citation omitted), but only a negligible number of class members opted out (30) and an even smaller number submitted objections (5). "The fact that only a handful of class members objected to the settlement . . . weighs in its favor." DeBoer v. Mellon Mortg. Corp., 64 F.3d 1171, 1178 (8th Cir. 1995). Also weighing in favor of the settlement are the views of the parties and their experienced counsel, each of whom urges that the settlement is fair and reasonable under the circumstances. Id.[9]

For all of these reasons, the Court concludes the settlement should be approved.

## C.    The objections lack merit

As noted above, five class members have submitted objections to the settlement. Those meriting any extended examination are discussed below. The Court finds that the remaining objections are trivial or raise issues that do not affect the substantial rights of the class. See Fed. R. Civ. P. 61 (court must disregard all matters "that do not affect any party's substantial rights").[10]

*Credit reporting.* One class member (Bennett) objects "to how the settlement excludes the negative report on [her] credit report." Although not entirely clear, the

---

[9] The Court ascribes little weight to Defendants' financial condition, the final factor in the analysis, see In re Wireless Tel., 396 F.3d at 932, as no party has addressed it. Regardless, the proceedings to date and Defendants' retention of several large law firms to represent them suggest they "have sufficient wherewithal to mount [an] arduous defense" in this case. Snell v. Allianz Life Ins. Co. of N. Am., Civ. No. 97-2784, 2000 WL 1336640, at *17 (D. Minn. Sept. 8, 2000) (Erickson, M.J.); see also Marshall, 787 F.3d at 512 ("The district court found that the NFL is in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation. No party disagrees with this finding. As such, we find this factor neutral.").

[10] Hashw correctly points out that certain of the objections have omitted required information, were untimely, or were defective for some other reason. The Court has nevertheless considered all of them.

Court assumes Defendants negatively reported Bennett's credit-card account to one of the major credit bureaus. She contends that "removing the negative reports should be a part of this settlement." The Court, however, enjoys no license to re-write the settlement or to expand its scope. E.g., Mba v. World Airways, Inc., 369 F. App'x 194, 197 (2d Cir. 2010); White v. Nat'l Football League, 822 F. Supp. 1389, 1426 (D. Minn. 1993) (Doty, J.). Further, negative credit reporting implicates the Fair Debt Collection Practices Act and/or the Fair Credit Reporting Act, not the TCPA, and hence is beyond the scope of the allegations in this case. Indeed, as Hashw points out in his response to the objection of two other class members (Spann and Tucker), the settlement is narrowly limited *only* to the act of using an autodialer, not negative credit reporting or any other conduct. Simply put, "[t]he settlement does not foreclose Settlement Class Members from pursuing . . . FDCPA or other claims." (Doc. No. 127 at 17.)

*Notice*. Three class members (Vitale, House, and Tucker) object that the notice provided to the class pursuant to the settlement agreement is insufficient and/or fails to satisfy due process. Vitale, for example, argues that *People* and *USA Today* are "pretty inadequate" publications in the 21st century, as the number of persons reading print magazines or newspapers is "dramatically decreasing." Similarly, House contends there is no explanation why these publications have been chosen.[11]

---

[11] House also argues the settlement contemplates a "press release" as "back-up" notice, but there is no press release involved in this case. It seems that House cut and pasted her objections from those filed in another case; Hashw notes that she and several others are "serial objectors" who likely submitted objections because they "want a financial payout." Marshall, 787 F.3d at 513.

Federal Rule of Civil Procedure 23(c)(2)(B) requires that notice to the class be "the best notice . . . practicable under the circumstances."  It need not be perfect; it must only satisfy the "broad 'reasonableness' standards imposed by due process."  Petrovic, 200 F.3d at 1153.  Here, direct notice was provided to all class members for whom Defendants had either an email or mailing address, comprising nearly 80% of the class.  Notice also was provided by the settlement website.  See In re Synthroid Mktg. Litig., 110 F. Supp. 2d 676, 680 (N.D. Ill. 2000) ("direct mailings, toll-free 1-800 numbers, [and] websites . . . are reasonable steps" to notify class), aff'd in relevant part, 264 F.3d 712 (7th Cir 2001).  But because Defendants lacked data for a portion of the class, notice also was published in *People* and *USA Today*, which together have a circulation exceeding 5 million people.  Notably, House acknowledges that "the best notice practicable is via . . . published media."  Furthermore, the class's very large "take rate" suggests that the notice campaign was successful.  All told, the Court finds that the notice was adequate under the circumstances presented here.

*Attorneys' fees*.  Several class members (Vitale, Spann, House, and Tucker) object to the requested attorneys' fees.  All contend the request – for 1/3 of the settlement fund, or approximately $4.166 million – is excessive, and several further object that class counsel have not submitted sufficient information from which the reasonableness of the requested fees can be determined.  (This is among the reasons the Court requested additional briefing on the fee issue at the fairness hearing.)

As noted below, however, the Court has significantly reduced the amount of fees to be awarded to class counsel.  More importantly, whatever merit these objections might

have, the Court need not disapprove the settlement because of them.  The settlement agreement expressly provides that it is not contingent upon Court approval of class counsels' requested fees.  And, the Court has already determined, when accounting for the fees to be awarded, that the amount remaining in the settlement fund entitles each class member to approximately $33.20, a reasonable sum.  The fee issue, therefore, need not undermine approval of the settlement.[12]

*Cy pres*.  Several class members object with regard to the settlement agreement's provision for a *cy pres* distribution.  One (Vitale) argues there should be no *cy pres* distribution at all.  Vitale and two others (Spann and House) further object that the *cy pres* recipients were not identified in the class notice.  And, House argues that the "majority of the class fund will end up going to the *cy pres* beneficiaries."  None of these objections is availing.

"The term '*cy pres*' is derived from the . . . French expression *cy pres comme possible*, which means 'as near as possible.'"  <u>Marshall</u>, 787 F.3d at 521 (Smith, J., concurring).  A *cy pres* distribution occurs when money funding a class-action settlement has been distributed to class members, and yet some remains.  As described by the Third Circuit:

> When class actions are resolved through settlement, it may be difficult to distribute the entire settlement fund, after paying attorneys' fees and costs along with fund administration expenses, directly to its intended beneficiaries – the class members.  Money may remain unclaimed if class members cannot be located, decline to file claims, have died, or the parties

---

[12] Several objectors also contend the proposed $27,500 incentive award to Hashw is excessive. As with fees, the settlement is not contingent upon Court approval of the incentive award.  And in any event, the Court has significantly reduced that requested award.

have overestimated the amount projected for distribution for some other reason. It may also be economically or administratively infeasible to distribute funds to class members if, for example, the cost of distributing individually to all class members exceeds the amount to be distributed. In these circumstances, courts have permitted the parties to distribute to a nonparty (or nonparties) the excess settlement funds for their next best use – a charitable purpose reasonably approximating the interests pursued by the class.

In re Baby Prods. Antitrust Litig., 708 F.3d 163, 168-69 (3d Cir. 2013). A *cy pres* distribution, therefore, becomes appropriate when settlement funds can no longer feasibly *directly* benefit the class, and hence they are used to *indirectly* benefit the class by going to an entity or entities aligned with "the nature of the underlying action." Marshall, 787 F.3d at 522 (Smith, J., concurring).

The Court finds the proposed *cy pres* distribution here reasonable and appropriate. The settlement is structured so that *cy pres* recipients will receive settlement funds only if it becomes economically impractical to redistribute those funds to the class, namely, if the amount to be distributed would result in payment of less than $3 to each class member. Contrary to House's objection, there is no reason to believe the majority of settlement funds will go to *cy pres* recipients. Indeed, the settlement provides that checks will be sent to all class members having submitted a valid claim form, and any funds remaining after that initial distribution will be *redistributed* to class members, *pro rata*, as long as the amount of that redistribution exceeds $3 each. The settlement's structure, therefore, sets the maximum amount of a *cy pres* distribution at approximately $750,000 ($3 each for 250,000 claimants), a fraction of the settlement fund, and inevitably it will be significantly less.

To be sure, several objectors correctly note that the settlement notice failed to inform the class of the proposed *cy pres* recipients.  In the Court's view, however, this poses no problem, as the amount of settlement funds left for *cy pres* recipients is likely to be *de minimis*.  In re BankAmerica Corp. Sec. Litig., 775 F.3d 1060, 1066 (8th Cir. 2015).  In any event, even if more than *de minimis* funds remained, In re BankAmerica strongly suggests that a settlement notice need not expressly identify proposed *cy pres* recipients.  See id. at 1067 n.6; see also In re Baby Prods., 708 F.3d at 180 ("[F]ailure to identify the *cy pres* recipients is not a due process violation [when] [c]lass members know there is a possibility of a *cy pres* award and that the Court will select among recipients proposed by the parties at a later date.").  This makes sense, given that notice is designed only to be reasonable under the circumstances.  Petrovic, 200 F.3d at 1153.  And, the now-proposed *cy pres* recipients – the Privacy Rights Clearinghouse and the Consumer Federation of America, two non-profit organizations addressing (among other things) consumer telephone privacy – were identified on January 12, 2016, when Hashw moved for approval of the settlement.  (See Doc. No. 121 at 8.)  Class members were permitted until February 19, 2016, to file documents in support of their objections.  (See Doc. No. 113.)  Hence, they were given the opportunity to object to these particular entities, but none did so.

*Claim submission requirements*.  Finally, two class members (Vitale and House) object to the claim form.  That form required each class member to provide his or her name, address, cell phone number, and type of credit-card account he or she had, as well as to sign an affirmation that the information on the form was true and correct.

According to House, the form should not have required class members to provide cell phone numbers, while Vitale argues the affirmation should have been made "to the best of the affiant's knowledge."  Yet, both the affirmation and the provision of cell phone numbers were designed to ensure that each person submitting a claim actually was a member of the settlement class, important here because Defendants did not maintain records of all persons they contacted during the class period.  Moreover, the claim forms were publicly available on the settlement website, and thus anyone in the United States could have obtained and submitted a form.  The affirmation and cell phone numbers, therefore, served as useful checks to prevent fraud.  See, e.g., In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (requirement that claim form be signed under penalty of perjury was "important in helping to insure that the settlement fund is distributed to class members who deserve to recover from the fund"); Mangone v. First USA Bank, 206 F.R.D. 222, 235 (S.D. Ill. 2001) ("The requirement of an affirmation on the claim form, under penalty of perjury, from the Settlement Class Member seeking reimbursement . . . was appropriate and not objectionable.").  Hundreds of thousands of valid claim forms were submitted.  The Court perceives no infirmity in the form.

For all of these reasons, the Objections will be overruled and settlement approval will be granted.

## II.      Fees and incentive award

### A.      Attorneys' fees

Hashw's counsel have requested an award of 1/3 of the settlement fund, or slightly less than $4.2 million, for litigating this case.[13]   The Court enjoys the authority to award fees in this case, but it must carefully scrutinize the request to ensure that any awarded fees are reasonable.   See Fed. R. Civ. P. 23(h); Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 243 (8th Cir. 1996).   This responsibility is particularly critical here, because (1) the settlement agreement contains a "clear sailing" provision, pursuant to which Defendants have agreed not to oppose fees up to 1/3 of the fund, and "the potential for abuse is heightened by [an] agreement not to contest fees up to a certain point," Johnston, 83 F.3d at 246 n.11, and (2) any award of fees will reduce the class's recovery, see, e.g., In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005); In re BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061, 1063-64 (E.D. Mo. 2002).

Typically, courts award attorney fees via the "lodestar method," multiplying the number of hours reasonably expended on a case by the reasonable hourly rates for the attorneys who expended those hours.   The resultant "lodestar amount" is a presumptively reasonable fee.   See Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010).   Yet, courts have recognized the lodestar method "is not perfect," id. at 551, and in some instances an alternative approach may be warranted.   Hashw's counsel ask the Court to utilize such an alternative approach here:   the "percentage" method, which permits a

---

[13] To be clear, this amount subsumes counsels' request for costs and expenses, totaling $18,422.34.   (See Doc. No. 135 ¶ 18; Doc. No. 136 ¶ 9.)

court to award fees "equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." Johnston, 83 F.3d at 244-45. Notably, the Eighth Circuit "recommends" the percentage method for common-fund situations such as the one presented here. Id. at 245; see also In re U.S. Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir. 2002).  And although the Court enjoys discretion to choose either the lodestar method or the percentage method, e.g., Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh, Pa., 735 F.3d 993, 1002 (8th Cir. 2013), given that the Eighth Circuit recommends the percentage method in common-fund cases, and that this method has been employed by courts across the country in TCPA class actions, the Court will use the percentage method here.

As noted, counsel have requested a percentage equal to one-third of the settlement fund, which falls in line with awards in several other cases involving TCPA class-action settlements.  See, e.g., Kolinek v. Walgreen Co., 311 F.R.D. 483, 502-03 (N.D. Ill. 2015) (36% fee award); Lees v. Anthem Ins. Cos., No. 4:13cv1411, 2015 WL 3645208, at *4 (E.D. Mo. June 10, 2015) (34% award); Vandevort v. Balboa Capital Corp., 8 F. Supp. 3d 1200, 1210 (C.D. Cal. 2014) (33% award).  Other TCPA cases, however, have been less apt to award such a high percentage of a common fund.  See, e.g., Craftwood Lumber Co. v. Interline Brands, Inc., No. 11-cv-4462, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (crafting fee award totaling 23.75% of settlement fund in TCPA class action); Rose, 2014 WL 4273358, at *13 (awarding amount equal to 8% of settlement fund); Arthur v. Sallie Mae, Inc., No. 10-cv-198, 2012 WL 4076119, at *1 (W.D. Wash. Sept. 17, 2012) (20% award); Grannan v. Alliant Law Group, P.C., No. C10-2803, 2012 WL

216522, at *10-11 (N.D. Cal. Jan. 24, 2012) (25% award).  There are a number of reasons

for this, including that TCPA cases are "prone to settle," Couser, 125 F. Supp. 3d at 1048,

since counsel experienced with TCPA litigation "know how to pick a winner" – that is,

cases with any real merit typically will resolve before summary judgment or class

certification takes place.  Rose, 2014 WL 4273358, at *12; see also In re Capital One, 80

F. Supp. 2d at 805 (because statutory damages are high for each TCPA violation,

defendants often face "bankruptcy-level exposure" that is "sufficient to compel an *in*

*terrorem* settlement before a liability determination is made").

     Here, while the Court commends counsel for obtaining a settlement with tangible

financial benefit to class members, it does not believe the circumstances warrant

awarding such a large percentage of the class's total recovery as attorney fees.  Although

this case involved some motion practice and victory was by no means certain, it did not

raise overly complex legal issues.  The case was filed in March 2013 and was stayed

approximately one year later when the parties agreed to mediation – which ultimately

resolved the case – and therefore did not necessitate a large time commitment by counsel.

The time sheets submitted by counsel confirm this, as they reflect a relatively low

number of hours expended over the course of this litigation in comparison to other TCPA

class cases.  Furthermore, the requested percentage is high given the size of the

settlement fund.  See Craftwood Lumber, 2015 WL 1399367, at *5 (noting that fee

percentages typically begin to drop when settlement amounts exceed $10 million).  All

told, the Court does not believe a fee award of one-third of the class's relief is appropriate

here.  See, e.g., Rose, 2014 WL 4273358, at *10-11 (awarding amount equal to

approximately 8% of fund where, as here, (i) each claimant would receive between $20 and $40, "in the lower range of recovery achieved in other TCPA class action settlements," (ii) the case settled after discovery and mediation, but before class certification, and (iii) the case lasted approximately three years from start to finish).

Cross-checking the requested fees using the lodestar method buttresses the Court's conclusion. Although the Court has opted to award fees using the percentage approach, that does not render the lodestar method irrelevant; the reasonableness of a fee awarded under the percentage approach can be "verified" by comparing it to the lodestar amount. Petrovic, 200 F.3d at 1157 ("[U]se of the 'lodestar' approach is sometimes warranted to double-check the result of the 'percentage of the fund' method."); In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig., 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (Doty, J.). This cross-check need not entail "mathematical precision [or] bean counting," In re Xcel, 364 F. Supp. 2d at 999 (citing In re Rite Aid, 396 F.3d at 306), but is intended to provide an approximation of a reasonable fee in order to "alert[] the trial judge" if a percentage award is "too great," In re Rite Aid, 396 F.3d at 306. As one court succinctly stated, where the percentage approach "would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage" accordingly. Rose, 2014 WL 4273358, at *7.

Here, assuming *arguendo* that all of the time expended on this case was reasonable and that all of counsels' hourly rates were reasonable,[14] the lodestar amount totals just

---

[14] Billing records for the three lawyers who worked on this case for Hashw contain some redundancy, and some of the requested hourly rates strike the Court as unsupportable. Attorney

shy of $420,000.  Counsel have requested nearly ten times that amount.  To be sure, the

percentage approach typically yields a fee some number of times higher than that

revealed by the lodestar method.  See, e.g., Rose, 2014 WL 4273358, at *7; In re Xcel,

364 F. Supp. 2d at 999.  Such a multiplier is justified for a number of reasons, including

the risks inherent in contingent-fee litigation, which is the typical manner in which class

actions are started.  See In re Rite Aid, 396 F.3d at 305-06 ("The multiplier is a device

that attempts to account for the contingent nature or risk involved in a particular case and

the quality of the attorneys' work.").  But while there is no set range of permissible

multipliers, see id., the Court has been unable to find *any* TCPA case awarding a

percentage fee even remotely close to ten times the lodestar amount.  See Couser, 125

F. Supp. 3d at 1049 (approving percentage fee equal to 2.8 times the lodestar amount);

Rose, 2014 WL 4273358, at *10 (analyzing TCPA cases with multipliers of 3.81, 2.59,

and 1.47, and various non-TCPA cases approving multipliers as high as 6.85, and

ultimately awarding fees with a multiplier of 2.59); Vandevort, 8 F. Supp. 3d at 1210

(approving percentage fee equal to 2.52 times the lodestar amount).

The Eighth Circuit has instructed that fee awards in the 20-25% range are

reasonable.  Petrovic, 200 F.3d at 1157 (quoting Court Awarded Attorneys Fees, Report

of the Third Circuit Task Force, 108 F.R.D. 234, 247 n.32 (3d Cir. 1985)).  Given the

---

Burke, for example, has requested $575 per hour, more than the Court believes the local market
would bear for a consumer-rights attorney who, like Burke, has approximately a decade of
experience.  See, e.g., Vandevort, 8 F. Supp. 3d at 1210 (finding requested hourly rates of
between $300 and $400 in TCPA case reasonable "given that each [attorney] has at least twenty
years of litigation experience"); see also Lamberson v. Bank of Am. Corp., Civ. No. 11-335,
2012 WL 4129807, at *3 (D. Minn. Sept. 19, 2012) (Montgomery, J.) (awarding Thomas Lyons,
Sr., an attorney with nearly 40 years of experience in consumer cases, $350 per hour).

nature of the claims asserted here, the time and expense of litigation, the results achieved, the quality of the work, and the awards in other TCPA class actions, as discussed above, the Court concludes that an award of 20% of the settlement fund – or $2.5 million – represents a reasonable fee for Hashw's counsel.

### B.    Incentive award

Finally, Hashw seeks a $27,500 "incentive" or "service" award for litigating this case as the named plaintiff on behalf of the class.  Courts have recognized the propriety of such awards, for "without a named plaintiff there can be no class action," and hence serving in that capacity "confer[s] a benefit on the (other) beneficiaries of the common fund."  In re Continental Ill. Sec. Litig., 962 F.2d 566, 571 (7th Cir. 1992); see also In re U.S. Bancorp, 291 F.3d at 1038.  Whether to approve such an award and, if so, the appropriate amount thereof is reserved to the discretion of the Court.  See In re U.S. Bancorp, 291 F.3d at 1038.[15]  Factors bearing on the decision include the actions taken by the named plaintiff to protect the class's interests, the degree to which the class has benefited from those actions, and the amount of time and effort the named plaintiff expended on the litigation.  Id.  A key additional consideration is whether an incentive award was necessary "to induce an individual to participate in the suit."  Fouks v. Red

---

[15] Indeed, because an incentive payment often results in a significantly higher recovery for the named plaintiff than other class members, courts must "scrutiniz[e] all [requested] incentive awards to determine whether they will destroy the adequacy of the class representative[]." Radcliffe v. Experian Info. Solutions, Inc., 715 F.3d 1157, 1164 (9th Cir. 2013); see also Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720 (E.D.N.Y. 1989) ("If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interest they are appointed to guard.").

Wing Hotel Corp., Civ. No. 12-2160, 2013 WL 6169209, at *2 (D. Minn. Nov. 21, 2013) (Ericksen, J.) (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Here, the Court concludes that an incentive award to Hashw is appropriate. As his counsel note, he was offered a fairly significant sum to settle this matter and turned that offer down to continue litigating. Rejecting the offer obviously benefitted the class, for otherwise there would be no settlement before the Court. Furthermore, there is some indication that Hashw participated in discovery, even though he was not deposed and there has been no specific accounting in the record (by Hashw or by his counsel) of the time he devoted to this case. Under the circumstances, Hashw should be rewarded for his service to the class.

That said, the Court finds the requested $27,500 excessive. There is no evidence before the Court that Hashw was an unwilling participant in this case or that he needed to be incentivized to file suit. Fouks, 2013 WL 6169209, at *2. Nor is there any evidence suggesting Hashw "faced any risks or burdens in undertaking this litigation." Id., at *3; see also In re U.S. Bioscience Sec. Litig., 155 F.R.D. 116, 121 n.14 (E.D. Pa. 1994) (considering "the risk to the plaintiff in commencing suit, both financially and otherwise" and "the notoriety and/or personal difficulties encountered by the representative plaintiff"). Though this case was pending for nearly three years, little involving Hashw happened after the parties agreed to mediation in 2014. Under these circumstances, the Court believes an incentive award of $15,000 is appropriate. See Martin v. Dun & Bradstreet, Inc., No. 1:12-cv-215, 2014 WL 9913504, at *3 (N.D. Ill. Jan. 16, 2014) (approving $20,000 incentive payment to named plaintiff in TCPA class action).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED**:

1.      Hashw's Motion for Final Approval of Class Action Settlement (Doc. No.

120) is **GRANTED**.  Accordingly, it is **ORDERED, ADJUDGED, AND DECREED**:

a.      The Settlement Agreement and Release dated July 22, 2015, including its

Exhibits (the "Agreement"), and the definition of words and terms contained therein, are

incorporated by reference and are used hereafter.  The terms and definitions of this

Court's Preliminary Approval Order (Doc. No. 113) are also incorporated by reference in

this Order;

b.      This Court has jurisdiction over the subject matter of this Action and over

the Parties, including all Settlement Class Members with respect to the Settlement Class

certified for settlement purposes in the Court's Preliminary Approval Order, as follows:

> All persons nationwide whose cellular telephone number, at any time on or
> after September 3, 2009 through July 22, 2015, Defendants (or either of
> their agents or affiliates) called using an artificial or prerecorded voice
> and/or using any automatic telephone dialing system where the call was
> placed for debt collection purposes in connection with a Macy's and/or
> Bloomingdale's credit card account and where the person called did not
> provide the number to Defendants and/or is not a person who had consented
> to receiving calls at that cellular telephone number.  Excluded from the
> Settlement Class are the Judge to whom the Action is assigned and any
> member of the Judge's staff and immediate family;

c.      The Court finds the Agreement was the product of arm's length settlement

negotiations between Plaintiff and Defendants;

d.      The Court finds that Class Notice was disseminated to persons in the

Settlement Class in accordance with the terms of the Agreement and that the Class Notice

and its dissemination were in compliance with the Preliminary Approval Order;

e.      The Court finds that the Class Notice and claims-submission procedures set

forth in the Agreement fully satisfy Federal Rule of Civil Procedure 23 and the

requirements of due process, were the best practicable under the circumstances, provided

due and sufficient individual notice to all persons in the Settlement Class who could be

identified through reasonable effort and support the Court's exercise of jurisdiction over

the Settlement Class as contemplated in the Agreement and this Order;

f.      The Court **APPROVES** the Agreement and finds that the terms constitute,

in all respects, a fair, reasonable and adequate settlement as to all Settlement Class

Members in accordance with Federal Rule of Civil Procedure 23;

g.      The Court **CERTIFIES** the Settlement Class for settlement purposes.  The

Court finds for settlement purposes that the Action satisfies all the requirements of

Federal Rule of Civil Procedure 23;

h.      The Court **APPROVES** the plan of distribution for the Settlement Fund as

set forth in the Agreement.  The Claims Administrator is hereby **ORDERED** to comply

with the terms of the Agreement with respect to distribution of Settlement Awards, the

Redistribution of Settlement Awards and disposition of any Remaining Funds thereafter.

Should any Remaining Funds be distributed, the Court hereby **APPROVES** Privacy

Rights Clearinghouse and Consumer Federation of America as the *cy pres* recipients;

i.       This Action is **DISMISSED WITH PREJUDICE**, without costs to any party, except as expressly provided for in the Agreement;

j.       As of the Effective Date, Plaintiff and each and every one of the Settlement Class Members unconditionally, fully and finally release and forever discharge the Released Parties from the Released Claims.  In addition, any rights of Plaintiff and each and every one of the Settlement Class Members to the protections afforded under Section 1542 of the California Civil Code and/or any other similar, comparable or equivalent laws will be terminated;

k.       Plaintiff and each and every Settlement Class Member, and any person actually or purportedly acting on behalf of Plaintiff or any Settlement Class Member, are hereby permanently barred and enjoined from commencing, instituting, continuing, pursuing, maintaining, prosecuting or enforcing any Released Claims (including, without limitation, in any individual, class or putative class, representative or other action or proceeding), directly or indirectly, in any judicial, administrative, arbitral or other forum, against the Released Parties.  This permanent bar and injunction is necessary to protect and effectuate the Agreement, this Order and the Court's authority to effectuate the Agreement, and is ordered in aid of the Court's jurisdiction and to protect its judgments;

l.       The Agreement (including any and all exhibits attached thereto) and any and all negotiations, documents, and discussions associated with it will not be deemed or construed to be an admission or evidence of any violation of any statute, law, rule, regulation or principle of common law or equity, or of any liability or wrongdoing by Defendants, or the truth of any of the claims.  Evidence relating to the Agreement will not

be discoverable or used, directly or indirectly, in any way, whether in the Action or in

any other action or proceeding, except for purposes of demonstrating, describing,

implementing or enforcing the terms and conditions of the Agreement, the Preliminary

Approval Order and/or this Order;

       m.     No agreements, documents or statements made by or entered into by any

Party in connection with the Settlement may be used by Plaintiff, any person in the

Settlement Class, Defendants or any other person to establish liability, any defense and/or

any of the elements of class certification, whether in the Action or in any other

proceeding;

       n.     In the event that any provision of the Agreement or this Order is asserted by

Defendants as a defense in whole or in part to any claim, or otherwise asserted

(including, without limitation, as a basis for a stay) in any other suit, action or proceeding

brought by a Settlement Class Member or any person actually or purportedly acting on

behalf of any Settlement Class Member(s), that suit, action or other proceeding shall be

immediately stayed and enjoined until this Court or the court or tribunal in which the

claim is pending has determined any issues related to such defense or assertion.  Solely

for purposes of such suit, action or other proceeding, to the fullest extent they may

effectively do so under applicable law, the Parties irrevocably waive and agree not to

assert, by way of motion, as a defense or otherwise, any claim or objection that they are

not subject to the jurisdiction of the Court, or that the Court is, in any way, an improper

venue or an inconvenient forum.  These provisions are necessary to protect the

Agreement, this Order and the Court's authority to effectuate the Agreement, and are ordered in aid of the Court's jurisdiction and to protect its judgments; and

o.     By incorporating the Agreement and its terms herein, the Court determines that this Order complies in all respects with Federal Rule of Civil Procedure 65(d)(1); and

2.     Hashw's Motion for Attorney Fees and Service Award (Doc. No. 114) is **GRANTED IN PART** and **DENIED IN PART**.  Class Counsel are awarded $2.5 million in fees and costs, and Hashw is awarded $15,000 for serving as named plaintiff, each of which shall be paid from the Settlement Fund.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date:  April 26, 2016                          s/Richard H. Kyle_____
                                               RICHARD H. KYLE
                                               United States District Judge